Good morning, Your Honor. Tony Farmani on behalf of Mr. Dunigan. Good morning. Your Honor, I'm not sure what the court wishes for me to argue, whether you want me to argue the procedural issues or the merits of the claim. I'll begin with the merits of the claim here. Mr. Dunigan. Why don't you tell me why, let's take procedure first. Why don't you tell me why you think that Mr. Dunigan's habeas is timely? Well, it's very simple, Your Honor. There were four different reports and recommendations that were issued in this case, as you may be aware. The last one was based on the fact that Mr. Dunigan relied on then-existing law, which was particularly Chavez v. Lamarck, where in this court, the court found, this court found, that a three-year delay, which was far longer than Mr. Dunigan's delay between the two habeas petitions, was sufficient for the tolling of the statute limitations. This was in 2009. Now, if you, that's precisely the reason why, and there's plenty of case law that have said so, that if you rely on then-existing law, in fact, you don't even have to rely on it. If there exists law out there. You say there's a case that says that a three-year delay in California habeas proceedings is not an unreasonable delay? Correct, Your Honor. In 2004, that was the case law in 2004. And what was it in that case? It was subsequently overruled by the U.S. Supreme Court in 2006. That was, which case was that? That was Evans v. Chavez. Evans overruled Chavez v. Lamarck. The Ninth Circuit in Chavez v. Lamarck said that a three-year delay, why, let me just back up for 2002. Kerry v. Saffold held, in that case, the California Supreme Court's decision had said, denied on the merits and for lack of diligence. Went up, the Ninth Circuit said, this was a decision on the merits. Went up to the U.S. Supreme Court. U.S. Supreme Court said, no, go back and reconsider. Court reconsidered it and said it wasn't denied on the merits. I think the court, in fact, certified the question to the California Supreme Court, which declined to answer that question. Then in the interim of all this, while Kerry v. Saffold was on the books, the Ninth Circuit was saying that, and correctly so, Your Honor, I feel, was saying at that point, that so long as you have a decision on the merits, then it is timely. Then it is pending within the meaning. Mr. Donegan was litigating his state habeas petition during that time. He relied on that law. That law was subsequently overturned by the U.S. Supreme Court, which basically said, no, it doesn't matter whether it's decided on the merits or not. The Federal courts should actually determine for themselves whether something is timely. He, he, Kerry v. Saffold was decided in June of 2002. Correct, Your Honor. And I guess the, the State's position is that put him on notice that he had a get on his horse and file. I can't imagine how, Your Honor, if the, if the Ninth Circuit, if a three-judge panel from the Ninth Circuit had interpreted Kerry v. Saffold, and the magistrate judge in this case, had interpreted Kerry v. Saffold to give Mr. Donegan green light to be able to litigate his claims the way he has. I can't imagine Mr. Donegan and Prosecutor Litigan at the time being able to say that Kerry v. Saffold put him on notice that he should be working harder. Well, he did file something in, I guess, the California Court of Appeal in May of 2003, right? Correct. What, what motivated him to all of a sudden file it? Well, all this time that was going on, he was investigating his claims, Your Honor. Particularly, he was, he had an investigator, he hired an investigator to go out and measure the, the assault with a deadly weapon scene and do measurements, do all that. All that is part of the record before the court. And he additionally was trying to get the video footage of the actual chase. So he was doing, he was working, he was working to develop a record for the court. And he was also, in a way, whether it be actual or constructively, relying on then existing law. In fact, there is a Ninth Circuit case, plenty of them, not just one, and they're cited all in the briefs, which say that it wasn't until 2006 when Evans versus Chavez was decided that the law became clear. If it weren't clear until 2006 for federal judges, for Ninth Circuit judges, I can't imagine that Mr. Donegan would have been on notice back in 2002 when Carey versus Saffold was on the books. And interestingly enough, the magistrate judge here relied on Carey versus Saffold when she found that Mr. Donegan, or when he found that Mr. Donegan was not untimely. Then the law changed. The magistrate judge issued an opinion saying, nope, he is untimely now. Then, then Mr. Donegan filed objections. And the magistrate judge, during that time, case law was, was coming out from the Ninth Circuit saying, if you, if, you know, people who relied on then existing incorrect law from our equitable tone. Are you telling me that between 2001 and 2006, a state habeas petitioner could spend all the time he wanted prior to filing, and it still would be a timely filing after being denied in another court, another California court? So long as the California Supreme Court had a postcard denial, that is true, Your Honor. So long as the California Supreme, which meant the postcard denial meant that was decided on the merits. Well, here though, what we're talking about is he files in the Superior Court a habeas proceeding, and then he waits 23 months before he files in the Court of Appeal. He doesn't have a Supreme Court postcard denial, does he? He has the California Court of Appeal postcard denial, petition for rare habeas denied. Then he went up to the California Supreme Court, which is the ultimate. Just hold on a second. Sure. His state habeas proceeding in 2001, I believe it was, was denied. He waits 23 months to file in the California Court of Appeal. You're Absolutely, Your Honor. That's all spelled out in the reply brief. All the cases are there for, for the benefit of the court. I'll take a look at that. And they are from this circuit. They are, they're from this circuit. In fact, that was the underlying premise for, for the fourth report and recommendation rejecting the state statute of limitations argument. And keep in mind, Your Honor, the state has litigated this issue to this court before by a writ of mandamus and was denied. I mean, I'm sure, a writ of mandamus may not be a decision on the merits. Nevertheless, we've litigated this issue over and over again. And I think the reason why... You want to start talking about the merits. Go ahead. Sure, Your Honor. The merits, it's fairly straightforward. I mean, Mr. Donegan has always challenged his, his accepted responsibilities for all his actions, except for the assault with a deadly weapon. Let me ask you about that. He was convicted of, what, two counts of vehicle taking? Sure. Two counts of evading an officer? Correct. One count of hit and run? Correct. And those aren't an issue here? Not at all, Your Honor. He got three consecutive 25-to-life terms, if I recall. Correct. Plus there's some other, there's some enhancements, I guess. Well, there's a five-year enhancement. It's called a nickel. If, if, if we were to agree with you, what would this conviction, putting aside the psyche, you know, the psychic of it, the fact that he's been working so hard to have this conviction... He could walk a little prouder in the prison, but I mean, is he going to get out? No, he's going to get out. How would he get out? He would be able to petition for resentencing under the reform, under the Reform Act. That again is also spelled out in the reply brief. Because what would happen is, now under the current existing, under the existing law, three strikes law in this country, a third strike must be a serious felony. Prior to that, the third strike could have been any felony. But now it has to be a serious felony. He's got that serious felony, assault with a deadly weapon, which with all due respect, Your Honor, he shouldn't, he should have never been convicted of that offense because the jury did not have the requisite tools. The jury did not have proper instructions. It's as simple as that. He cannot petition for resentencing unless this conviction goes away? That's correct, Your Honor. It would give him an opportunity to re-petition for resentencing and be able to at least be considered for it. I mean, and also I think it would help clarify that when there is an existing case, when there is existing instruction in the books and case law, that an attorney should be able to argue that to the trial court, should be able, should be cognizant of it and be able to say, hey, look, you know, there's law that supports my defense here. He drove a car at breakneck speed toward the car of a police officer. You think that the jury can't assess that as assault with a deadly weapon? I don't think the jury, I don't think we can speculate on that, Your Honor. I mean, the instructions given wasn't that or was there other means likely to inflict serious injury? Isn't an automobile, say 2,000, 3,000 pounds, a weapon that can inflict serious injury? What is important here, Your Honor, is that back in 1997 and subsequently in 2001, the California Supreme Court in 2001 and the California that was given to the jury, it was defective. That's number one. Number two, the deadly weapon, the assault with a deadly weapon was never defined. California law is very clear. If it's something that is not inherently dangerous or inherently a deadly weapon, such as a car, such as a pen, then you have to also show that the defendant intended to use it as a deadly weapon. I mean, this whole case came down to his intent. That's what it came down to. The jury asked... He wasn't negligently driving the automobile towards the officer, was he? Negligently is not sufficient to be able to... I agree with you. But your position is not that he was negligently driving the automobile towards the, after he turned around and headed toward him? He didn't turn around. He was, he went to a, he couldn't go any further. Well... It was a roundabout, so he had to turn around. He didn't turn around to hit the officer. I apologize, Your Honor, maybe I wasn't clear enough. He was, he had no other choice to turn around. What is critical here is the officer is saying over and over... He had the choice of stopping. No, he didn't, because he was trying to flee. He had a choice, you're right, he had a choice, but his intent was to flee. And then there's some psychiatric problems here going on too as well. And you know, you have to also take into consideration, Your Honor, respectfully, that the jurors here asked for the readback of Officer Schofield's testimony, precisely for that purpose, for the assault purpose. So I don't see how a court can't affirm a conviction or an eviction can be obtained when a jury did not have the benefit of a jury instruction on an actual element of the crime. Which was? Which was that he intended to use that car as a deadly weapon. That is required under California law, Your Honor. California has overturned robbery convictions, where there's a death has even occurred in those robbery convictions, because the court said, if the jury wasn't instructed on that particular, the intent element, then we can't affirm the conviction. Did you want to save a couple of minutes, Mr. Piemonte? Absolutely, Your Honor. Thank you very much. Thank you. Good morning. Good morning, Your Honor. May it please the court, I'm Kevin Viena, California Deputy Attorney General on behalf of Respondent. In response to a couple of questions that the court asked my opponent, one question from Judge Bay was whether two years is too long for a California court to consider that he had filed his subsequent habeas corpus petition within a reasonable period of time. The law in this circuit was in his favor, certainly until Carey v. Saffold in 2001. We think Carey v. Saffold gave him the notice that he needed to file within a reasonable period of time. Mr. Formani says it wasn't until Evans v. Chavez came down. I guess what I would say is that I think it's correct that the Ninth Circuit hadn't figured that out until 2006, but I think a diligent petitioner should have recognized or could have recognized the risk he took by engaging in any further delay. There's something incongruous about saying a petitioner should have known it even though the Circuit didn't realize it for a few more years. I don't dispute the tension there. That's our position, Your Honor. Okay. What about the merits? If we get to the merits, our fundamental position is that even if there were some conceivable defect in the instructions here, they didn't work to the prejudice of Mr. Dunnegan in any way. With regard to the instruction on assault, 9.00, the instruction which occurs in your record at Excerpts of Record, page 610, says that in order to find Dunnegan guilty, he had to willfully and unlawfully commit an act. It's quite clear that he willfully and unlawfully committed an act. That is, he drove a car at a police officer. It is also without question, and Mr. Farmani has pointed it out to the Court, that California has struggled with the definition of assault over time. But Williams made clear that the case on which he primarily relies, Smith, which is the only case that he relies on that preceded the trial in Mr. Dunnegan's case, says that Smith said that defense counsel should have known that that instruction was incorrect. We disagree with that strongly. Smith was decided only a couple of months before the trial in this case. Smith involved not this jury instruction, but the 1988 version of that jury instruction. And Smith involved, importantly, critically different facts. In Smith, the defense was Smith ran over the leg or struck the leg of a peace officer while there was a stop out in a traffic stop. And Smith's defense was that he had been waved forward by another officer who was present. So the question of intent there was sort of different and critical. That is, Smith's defense was, I was doing only what I was told. In this case, there's no indication by any means that Dunnegan was doing what he was told. In fact, he was doing the opposite of what he was required by the law to do, which was to stop. And he continued. Consequently, we think it would be completely inappropriate to say that this defense counsel was deficient. Her performance was deficient for failing to recognize that Wright might have provided a basis for a different, that Smith might have provided a basis for a different instruction because it involved not the instruction that was used in Dunnegan's trial. That was a later revision, and the circumstances were so completely different. Finally, we think, oh, finally, I would say that a defense counsel who relied on Smith would ultimately have been proved wrong because Williams says that Smith got it wrong. In Williams, a couple of years later and after the trial of this defendant, the California Supreme Court returned to the question of mens re for assault and said that the court in Smith was wrong because it essentially did what Mr. Farmani has been trying to do here, and that is to turn a general intent offense, assault in California, into a specific intent offense. With regard to the other instruction, that is the instruction about, or the absence of an instruction defining a deadly weapon, as we made clear in our brief, there was an alternative basis, or there's an alternative basis for finding of guilt, and that is the instruction to the jury was that he committed the crime either with a deadly weapon or by means of force likely to inflict grievous bodily injury. And as an earlier question indicated, a 3,000-pound automobile hurtling at someone is obviously a deadly weapon or is obviously a means likely to inflict grievous bodily injury. So once again, there was no fundamental flaw in the instruction of the jury here. The case was tried on this theory. Dunnegan says, my goal was not to collide with or to cause concern of a collision in anyone. My goal was simply to escape. The prosecutor said that's foolishness because what he was doing was playing chicken, intent on, determined to escape, and willing to place at risk the personal injury of the officer who had blocked him in the cul-de-sac. Consequently, so we think on the failure to instruct on the definition of a deadly weapon, that definition does not require someone to show that it was intended to be used to harm someone. It simply required, the law in California required them to show that the instrument was used in a manner. So once again, it's not a specific intent offense, and the presence of a deadly weapon does not convert it into a specific intent offense. The question is for the jury, was this something that could be seen as something that was used in a manner likely to inflict death or great bodily injury, and that instruction is in the excerpts of record at page 607. Accordingly, we think that on the merits, the California court's silent denial of Grounds 8 and 9, that is the deadly weapon instruction or the failure of counsel to ask for the deadly weapon instruction, fails on all prongs. That is, there's no ineffective assistance because a fair-minded jurist could reasonably conclude that there was no deficient performance in failing to ask for something that was unnecessary, and there was no prejudice here because the circumstances of the case were not cases like Smith or cases like Williams where there were unusual circumstances. Williams, for example, involved someone who shot at a car and quite possibly, quite probably even, didn't know that there was someone in the car. And the court said the general intent required for an assault in that case requires the defendant to have some awareness of the circumstances that make his conduct likely to cause a battery. And if Williams didn't have that type of knowledge, then he wasn't guilty of assault of the people who were in the car. But that was Mr. Farmani that if we were to agree with him, the result would be that he remains in prison but has the right to file a request for a resentencing. Is that how you see it, too? I think that's correct, Your Honor. That is, right now he is statutorily ineligible to ask for a rehearing or for a resentencing because the aggravated assault crime is a serious or violent felony. The other crimes don't seem to qualify. That doesn't mean that he's going to get out, though. It simply means that he can ask for a review by the superior court, and the superior court would look at his prior convictions, his record, and the nature of this crime to consider whether he's dangerous. That's California Penal Code Section 1170.126. And we think there's a decent chance that a court would find him dangerous or in other circumstances might find him dangerous because he had 10 prior robberies, I believe, and this crime involved not just danger to the officer but a collision with a bystander during the second evasion. So he behaved quite dangerously in both evasion circumstances. But I would agree that he would not be statutorily ineligible. Of course, I think Mr. Farmani has also made clear that that's unlikely. We tried to but were unable to, did not succeed in finding what the status of his request for compassionate release is. I think based on the information that's available that Mr. Dunnigan is going to get compassionate release quickly. If court has no further questions. By quickly, you mean what? I think as soon as he appears before the court. So I would suspect, it looks to me like the timing should be within no longer than a couple of months. Please explain to me how he can get a court hearing on compassionate release unless we reverse. No, that's a separate issue, Your Honor. I think he qualifies for compassionate release based on. Is it a health issue? The imminence of his health problem. He's predicted, as Mr. Farmani has said, and we don't disagree with that, that his lifespan is not expected to go beyond five months from when Mr. Farmani filed his last letter. So it's less than that now. What's his disease? He has cancer, Your Honor. Okay. Are you interested in stipulating to his release? Is that something that can be done? We don't spend a whole lot of time on. It's something that I don't have the authority to do. I am interested, I mean, what I think might be appropriate. I'm particularly interested that defense counsel not be labeled as ineffective in this circumstance because I don't think that's correct and I think that would be unfair to put that badge on defense counsel. If the court wanted to stay action on this or delay this for a brief period of time until we know what's going to happen with the compassionate release, we'd be fully in favor of that. If we were to do that, would you be in a position to let us know in a week or two whether you can? I certainly think that I could let you know in a week or two whether there is currently a hearing scheduled or when that hearing is supposed to happen. I don't think I'd be in a position to guarantee that he'll have the hearing within a week or two. Or that you'd stipulate to his release? I think that's beyond my authority. Although the California Attorney General represents the Department of Corrections in these matters, we really are representing the people in the argument on the conviction. An item like compassionate release would be more to the discretion of the court and CDCR could take its own position and we wouldn't be representing them on that issue. If you could call them and ask them what they thought. I can try to do that if the court wants me to, Your Honor. Mr. Viena, was there anything else you wanted to say? No, there was not, Your Honor. Thank you very much. Thank you, Your Honor. Mr. Paramani? I have a little bit more information than Mr. Viena about the compassionate release. I filed a letter with the court. The president has actually said that Mr. Donahue is not a danger to society. And that's quite correct, Your Honor. He did have a heroin addiction 20 years ago when this happened. He's 71 years old now and he's terminally ill. And I think counsel is trying to persuade the court to wait and not issue a decision on the assault conviction. But I really believe that the assault conviction here should not stand. And not only I believe it, Your Honor. It's supported by case law. To say that an attorney should not be aware of existing case law about the one and only defense challenged at trial. But what you're saying is that assault is a specific intent crime. I'm not saying that, Your Honor. I'm saying... And he should know that. But that's not the state of the law, is it? That is not the law. You're correct, Your Honor. But at the time, the California Court of Appeals, in this case, did not review the assault question. Why? Because defense counsel has failed to object to it. That speaks volumes, Your Honor. That speaks volumes. So what if they didn't review it? If the law is not assault is a specific intent crime, a lack of review is not prejudicial to you. No, it's not. Because if it would have been reviewed by that time, Smith had already been affirmed. It would have been before... Then you're changing your position. You're saying Smith held that assault is a specific intent crime in California. No. Smith held that the assault instruction given to the jury here was defective. And to say that there was a different instruction in Smith is absolutely incorrect. Smith itself, and I quote, this definition is in essence Cal JIC number 9.0 1994, the exact assault conviction. And later on, another court, People v. Wright, said the same thing. So at the time that Mr. Donegan was litigating his appeal, he would have had the benefit of a Smith decision. But now we know that Smith was wrong. Not necessarily, Your Honor, because People v. Williams approvingly cited Smith. If you look at... We come down to the question, is it your claim that assault in California is a specific intent or a general intent crime? Can you tell me that? Your Honor, it's a general intent crime. Of course it is. And I completely agree with you, Your Honor. And therefore it was error, it was ineffective assistance of counsel for the defense counsel not to pick up on the Smith case and say this instruction should have been given to show that specific intent was a required element? It wasn't. Smith didn't say it was a specific intent. Smith never said that. Smith said that the natural probable consequences language is a reasonably foreseeable language. It's not something that you can base an assault conviction on. That's what Smith said. It never determined whether it was... Because it doesn't provide for the intent to cause injury. No, no. Smith said the fact that the jury was given that defective instruction, the defendant didn't have an opportunity to put his defense in front of the jury, although he testified that... The defense being I didn't intend to injure. Yeah. Which is not a required element. That was only one aspect of the court's decision. But let's not forget, Your Honor, that there's another part of this assault instruction here that was effective. With regard to the definition of deadly event... All right. I think I've got that. Let me ask you this. These questions, both the merits and also the timing, are kind of tricky. Maybe you're right, maybe you're not. I mean, these are difficult issues. Mr. Dunnigan's interest is getting out of prison before he dies, and I take Mr. Vienna as a gentleman of good faith if he says he would call the Department of Corrections and, you know, see what they can do. Wouldn't it be Mr. Dunnigan's advantage to give him a week and see what Mr. Vienna can do I don't think Mr. Vienna, as indicated, has the authority. Well, he doesn't have it as he's sitting here today, but he said he would make some calls and see what he could do. I've made those calls, and it's clear that he's going to go in front of a Superior Court judge. The Superior Court judge is going to look at the report, which is in his favor, but both medically and by the prison institution evaluating him, his conduct, throughout the 20 years that he's been there. And he's crime-free. He's been a model prisoner, if you will. And he's an extremely intelligent person. He's got a great family, and they know that. His sister is a nurse. Do you want him to see if he can get authority to stipulate to your guy's release? Oh, I would, yeah, absolutely. But I think this would help in the sense that Mr. Dunnigan has been working so hard to get this assault conviction reversed. And for it to be reversed, it would mean tremendously to him. And for this court to clarify, I mean, forget about the statute of limitations and the procedural default issue. It's nonsensical, frankly. It has absolutely no bearing on the merits at all, and it makes no sense. The law has already been clear on that. The law has been clear. 2006, Kerry v. Saffold, 2002, 2006, it was clarified. The Ninth Circuit didn't know the meaning of Kerry v. Saffold quite clearly as the Supreme Court had defined it. And it's the end of that. And then the procedural default, I mean, to say that the California Supreme Court did not, that procedurally, that he procedurally defaulted claims 8 and 9, which would be 2 and 3 in a brief, it just makes absolutely no sense. He submitted the claim to the California Supreme Court. He got a letter back stating that we received it, your petition is under consideration, and then a postcard denial, as they often do, within probably six, seven months later. So I think it would make a difference in Mr. Donegan's life. I don't think it necessarily, and I think it would clarify the issue that if you're a counsel and you're representing someone who's facing a life term, you should do your homework. You know, I'm not suggesting, Judge, that Smith was necessarily written in stone, but what I'm suggesting is, Your Honor, when you're representing someone who is facing a life term, whose life hangs in balance, you should at the very least research the law, not just consent to it. Okay. Thank you both, gentlemen. Thank you. The case argued is submitted. It will stand in recess for today. Thank you.
judges: Bell, Silverman, Bea